[No. E048123. Fourth Dist., Div. Two. Nov. 18, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
ISRAEL PONCIO POROJ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part IV.B. and C.

COUNSEL

Daniel J. Kessler, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Gil Gonzalez, Garrett Beaumont and Marissa Bejarano, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KING, J.—

## I. INTRODUCTION

Defendant Israel Poncio Poroj was driving eastbound on the Ramona Expressway in a Ford F-150 truck when he swerved into oncoming traffic and collided head on with a small pickup truck occupied by Salvador Gonzaga and his wife, Maria Gonzaga. Defendant admitted he had been drinking several hours before the collision. Salvador Gonzaga was killed in the collision. Maria Gonzaga suffered soft tissue injuries and was hospitalized for 36 hours.

A jury found defendant guilty as charged of second degree murder for the death of Mr. Gonzaga (Pen. Code, § 187, subd. (a); count 1),[1] driving under the influence of alcohol and causing bodily injury (§ 23153, subd. (a); count 2), and driving with a blood-alcohol level greater than 0.08 percent and causing injury (§ 23153, subd. (b); count 3). The jury also found defendant personally inflicted great bodily injury (GBI) on Mrs. Gonzaga in counts 2 and 3. (§ 12022.7, subd. (a).)

The principal issue on this appeal is whether the jury was properly instructed on the GBI enhancement allegations in counts 2 and 3. Section 12022.7, subdivision (a) provides: "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

felony or attempted felony shall be punished by an additional and consecutive term of imprisonment . . . ." Defendant claims "the GBI enhancement has its own intent requirement, independent of the intent required for the underlying felony, and the jury must be instructed on that intent element."

In the published portion of this opinion, we explain that section 12022.7, subdivision (a) does not require a showing of intent to inflict GBI, separate or apart from the intent required to commit the felony or attempted felony for which the enhancement provision prescribes additional punishment. Rather, the statute only requires a showing that defendant "personally inflict[ed]" great bodily injury "in the commission of a felony or attempted felony . . . ." (§ 12022.7, subd. (a).) Thus, the only intent required to support a GBI enhancement under section 12022.7, subdivision (a) is the intent required to commit the underlying felony or attempted felony.

## II. STATEMENT OF FACTS

On March 6, 2008, at approximately 11:50 p.m., defendant was driving eastbound on the Ramona Expressway near Birch Street in a Ford F-150 truck when he swerved into oncoming traffic and collided head on with a small pickup truck. Mr. Gonzaga was driving the pickup truck and his wife, 67-year-old Mrs. Gonzaga, was in the passenger seat. Mr. Gonzaga was killed in the collision. He suffered blunt impact injuries to his torso, including tears in the left auricle of his heart. Mrs. Gonzaga was knocked unconscious and taken to a hospital.

The trauma surgeon who examined Mrs. Gonzaga at the hospital testified she had "soft tissue injuries in the neck, chest, abdomen, and left shoulder," but no internal injuries or fractures. CT scans of the left shoulder were "unremarkable" and X-rays showed "an old fracture of the clavicle." A preliminary CT scan was also "unremarkable," though the treating physician testified it was "possible for there still to be problems that manifest themselves later as a result of the impact." Mrs. Gonzaga was discharged after 36 hours with the "understanding that there were no serious injuries requiring continued treatment . . . ."

At trial in February 2009, Maria Gonzaga claimed she was still suffering from the effects of her injuries. She had trouble maintaining her balance while walking, trouble urinating, and trouble with her ears. Her head also hurt from time to time and her left shoulder still hurt and had not "healed up." She claimed a bone in her shoulder had "popped out" during the collision.

Linda Belikoff was driving westbound on the Romona Expressway at the time of the collision, behind Mr. and Mrs. Gonzaga's truck. Belikoff saw an eastbound vehicle, a "larger truck" or "F-150," hit Mr. and Mrs. Gonzaga's "little pickup truck" "head-on." Immediately after the collision, Belikoff approached defendant's truck and found him trapped inside. Defendant's leg was stuck and he kept repeating, "Get me out. Get me out." Belikoff was unable to open the door of defendant's truck but told him she had called 911 and help was on the way. Belikoff noticed that defendant's speech was slurred and she could smell alcohol emanating from him.

California Highway Patrol Officer Stephen Whelan arrived at the scene of the collision shortly after paramedics and other law enforcement officers arrived. Defendant was on a gurney with a "substantial injury to his lower left leg," after being extracted from his truck by fire department personnel. Officer Whelan had a brief conversation with defendant while he was lying on the gurney. Officer Whelan noticed an "incredibly strong odor of alcohol" on defendant's breath, his speech was slurred, and his eyes were red and watery. Officer Whelan initiated a driving under the influence (DUI) investigation.

At 12:30 a.m., Officer Whelan administered a "preliminary alcohol screening test" on defendant using an "Alcohol Sensor IV" machine, which is designed to take a blood-alcohol reading from a person's breath sample. Defendant consented to the test, but did not blow into the machine with sufficient force for it to make an "automatic capture," so Officer Whelan captured the breath sample manually. This test showed defendant had a blood-alcohol level of 0.206 percent. About two minutes later, Officer Whelan asked defendant to take the test a second time in order to have two test results to compare, but defendant began "shaking his head no and waving his hand like he didn't want to take the test." Officer Whelan interpreted defendant's gestures to mean he was withdrawing his consent to take the test.

Based on the initial breath test result and his observations of defendant, Officer Whelan concluded defendant was under the influence of alcohol. A sample of defendant's blood was taken at the hospital at 2:32 a.m. on March 7, about two hours forty-two minutes after the collision. The blood sample showed a blood-alcohol level of 0.22 percent. A criminalist testified that, allowing for a normal "burn off rate," defendant's blood-alcohol level would have been 0.26 percent at the time of the collision.

Measurements and other evidence taken at the scene of the collision showed that defendant's vehicle crossed into opposing lanes and caused the crash. Based on the physical evidence and his interviews of Belikoff and other witnesses, Officer Whelan concluded the collision was caused by

defendant's failure to stay on the right side of the roadway in violation of Vehicle Code section 21650, and defendant's "unsafe turning movement" in violation of Vehicle Code section 22107.

Officer Whelan interviewed defendant at the hospital at approximately 3:48 a.m. on March 7 with the assistance of Riverside County Sheriff's Deputy Roberto Navarrete, a Spanish language interpreter. After waiving his *Miranda*[2] rights, defendant told the officers he had been in Riverside painting a house, left around 8:00 p.m., and was on his way home to San Jacinto at the time of the collision. He drank three beers between the hours of 5:00 and 5:30 p.m., he had not been taking any drugs or medications, he did not have diabetes or epilepsy, and he was not under the care of a physician. He believed the collision was caused by the Gonzagas's pickup truck coming into his lane and colliding with his truck. He also told the officers he had been arrested twice before for DUI and that his driver's license was suspended at the time of the collision.

At trial, the parties entered into the following stipulations: (1) on March 6, 2008, defendant's driving privileges were suspended and defendant knew of that suspension; (2) on May 25, 2004, defendant pled guilty and was therefore convicted of driving on a suspended license on December 27, 2003; (3) on September 8, 2000, defendant pled guilty and was therefore convicted of DUI in four separate misdemeanor cases on July 23, 2000, November 28, 1998, March 18, 1997, and March 24, 1996; (4) in the three earliest of defendant's four prior DUI cases, defendant failed to appear in court on one or more occasions, and ultimately pled guilty to all four cases on the same day; (5) as a condition of probation in the DUI cases, defendant was ordered to complete the Multiple Offender Drinking Driver Program (SB-38 program); (6) in the DUI offense occurring on March 24, 1996, defendant collided with two parked cars, walked away from the scene, and was brought back by a police officer. His blood-alcohol content (BAC) in breath test results was 0.31 percent and 0.29 percent; (7) defendant's DUI offense occurring on March 18, 1997, involved BAC breath test results of 0.23 percent and 0.22 percent; (8) defendant's DUI offense occurring on November 28, 1998, involved BAC breath test results of 0.24 percent and 0.24 percent; and (9) defendant's DUI offense occurring on July 23, 2000, involved a BAC blood test result of 0.10 percent.

On May 20, 2003, as a condition of his probation from his prior DUI convictions, defendant completed an 18-month SB-38 program which stressed the dangers of drunk driving. During the interview with Officer Whelan and Deputy Navarrete, defendant was asked whether he knew how dangerous it was to drive drunk. Defendant responded: "I know a lot of people die from getting hit by drunk drivers." Then, when asked why he

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

drank and drove that night, defendant responded: "I wasn't that drunk, I guess that it's just stupidity in my life . . . ."

## III. PROCEDURAL HISTORY

The jury found defendant guilty as charged of the second degree murder of Mr. Gonzaga in count 1 (§ 187, subd. (a)), driving under the influence of alcohol and causing bodily injury to Mrs. Gonzaga in count 2 (Veh. Code, § 23153, subd. (a)), and driving with a 0.08 percent or higher blood-alcohol level and causing bodily injury to Mrs. Gonzaga in count 3 (Veh. Code, § 23153, subd. (b)). The jury further found that defendant personally inflicted GBI on Mrs. Gonzaga in counts 2 and 3, within the meaning of Penal Code section 12022.7, subdivision (a).

Prior to the close of the evidence, and for purposes of counts 2 and 3, defendant admitted having two prior DUI convictions and a prior conviction for driving on a suspended license. He also admitted he was driving with a BAC of over 0.15 percent at the time of the March 7, 2008, collision, qualifying him for enhanced penalties at sentencing. (Veh. Code, § 23578.) He pled guilty to driving on a suspended license, a misdemeanor, as charged in count 4. (Veh. Code, § 14601.1, subd. (a).)

The trial court sentenced defendant to an aggregate term of 21 years to life in prison, consisting of 15 years to life on count 1, the upper term of three years on count 2, plus a consecutive three-year term for the GBI enhancement on count 2. Additional terms were imposed but stayed on count 3 and on the GBI enhancement on count 3. (§ 654.)

The abstract of judgment and the sentencing minute order indicate the trial court ordered defendant to pay a $10,000 restitution fine (§ 1202.4, subd. (b)) and a $10,000 (suspended) parole revocation fine (§ 1204.45). Near the end of the sentencing hearing, however, the court stated that the restitution fine (and therefore the parole revocation fine) should be $9,000. The probation department had recommended $9,000 fines.

## IV. DISCUSSION

### A. *The Jury Was Properly Instructed on the GBI Enhancement Allegations*

Defendant claims the section 12022.7, subdivision (a) enhancements for personally inflicting GBI on Mrs. Gonzaga in counts 2 and 3 must be reversed because the trial court erroneously failed to instruct the jury on the mens rea or general intent element of the enhancements. He claims this instructional error deprived him of his federal and state due process rights

and was not harmless beyond a reasonable doubt. We conclude the jury was properly instructed on the enhancements.

### 1. *Standard of Review*

Our standard of review is well settled. "We determine whether a jury instruction correctly states the law under the independent or de novo standard of review. [Citation.] Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' [Citation.]" (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088 [78 Cal.Rptr.3d 186].)

### 2. *Analysis*

Section 12022.7, subdivision (a) provides: "Any person who *personally inflicts* great bodily injury on any person other than an accomplice *in the commission of a felony or attempted felony* shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." (Italics added.)

Though he concedes the jury was properly instructed it had to find he acted with general criminal intent in order to convict him of the felony DUI charges in counts 2 and 3, defendant argues the trial court erroneously failed to instruct on the intent element of the enhancement allegations. Specifically, he argues section 12022.7, subdivision (a) required the People to prove he acted with a general intent to inflict GBI, or that he "intentionally committed" the act that caused the injury to Mrs. Gonzaga "on purpose." We disagree.

■ As we explain, section 12022.7, subdivision (a) does not require a showing of intent to inflict GBI, either general or specific. Rather, in order to have found the enhancement allegations true in counts 2 and 3, the jury only had to find defendant acted with general intent in committing the underlying DUI felonies and *personally inflicted* GBI on Mrs. Gonzaga *in the commission of those felonies.* (§ 12022.7, subd. (a).) The jury was so instructed; thus, there was no instructional error or due process violation.

■ In support of his claim that section 12022.7, subdivision (a) has its own mens rea requirement, defendant relies on section 20, which states: "In every crime or public offense there must exist a union, or joint operation of act *and intent* . . . ." (Italics added.) But section 12022.7, subdivision (a) does not define a crime or public offense. Rather, it is typical of many sentencing enhancement statutes that "do not purport to define a criminal offense but simply relate to the penalty to be imposed under certain circumstances." (*People v. Ross* (1979) 92 Cal.App.3d 391, 403 [154 Cal.Rptr. 783].) As

Division One of this court has observed: "Section 12022.7 does not define a separate offense, but rather is a legislative attempt to punish more severely those crimes that *result* in great bodily injury . . . . [Citations.]" (*People v. Verlinde* (2002) 100 Cal.App.4th 1146, 1168 [123 Cal.Rptr.2d 322], italics added (*Verlinde*).)

Thus, Penal Code section 12022.7, subdivision (a) is not required to contain, and by its terms does not contain, an intent element in addition to the general or specific intent element of the underlying felony or attempted felony to which it applies. "This is permissible because [the statute] do[es] not criminalize otherwise innocent activity, since [it] incorporate[s] the underlying crime[], which already contain[s] a mens rea requirement. [Citation.]" (*People v. Coria* (1999) 21 Cal.4th 868, 879–880 [89 Cal.Rptr.2d 650, 985 P.2d 970] (*Coria*) [distinguishing mens rea requirement of Health & Saf. Code, § 11379.6, which prohibits manufacture of certain controlled substances, with absence of a mens rea requirement in statutes prescribing enhanced penalties for distributing illegal drugs within 1,000 feet of a school or exceeding certain weight limits].) Simply put, once a defendant is convicted of committing a felony or attempted felony, his sentence on that crime may be enhanced by three years pursuant to Penal Code section 12022.7, subdivision (a) if the jury finds the defendant, in fact, "personally inflicted" GBI on a person other than an accomplice in the commission or attempted commission of the felony or attempted felony.

Another court has noted that section 12022.7, subdivision (a) "has been interpreted to require only a general criminal intent, i.e., the defendant need not intend great bodily injury result, the only intent required is that for the underlying felony." (*People v. Lewis* (2004) 120 Cal.App.4th 837, 853 [15 Cal.Rptr.3d 891], fn. omitted (*Lewis*), citing *Verlinde, supra*, 100 Cal.App.4th at pp. 1165–1168 & *People v. Carter* (1998) 60 Cal.App.4th 752, 755–756 [70 Cal.Rptr.2d 569] (*Carter*).) In making this observation, *Lewis* interpreted the term "willfully" in section 1202, subdivision (e)(3) as requiring "intent to cause great bodily injury or torture," and compared and contrasted the language of section 1202 with that of section 12022.7, subdivision (a). (*Lewis, supra*, at p. 853.)

■ Defendant relies on *Verlinde* and *Carter*, the two cases cited in *Lewis*, to support his argument that section 12022.7 subdivision (a) requires intent to commit the act causing GBI or general intent to inflict GBI, in addition to and apart from the intent required to commit the underlying felony or attempted felony. In effect, defendant agrees with the *Lewis* court's observation that section 12022.7, subdivision (a) "requires only a general criminal intent," but he disagrees that this means "the defendant need not intend great bodily injury result, the only intent required is that for the underlying felony."

(*Lewis, supra,* 120 Cal.App.4th at p. 853, fn. omitted.) As we explain, *Verlinde* and *Carter* both held that section 12022.7, subdivision (a) requires a showing of general criminal intent but conflated that showing with the intent required to commit the underlying felony or attempted felony. Nevertheless, *Lewis* properly interpreted the enhancement statute as *not* requiring intent to commit GBI, but only an intent to commit the underlying felony or attempted felony. (*Lewis, supra,* at p. 853.)

In *Verlinde*, the defendant, Wendy Verlinde, spent a night out drinking with friends in Tijuana. There they met Mark Vessells and offered him a ride home to Los Angeles. (*Verlinde, supra,* 100 Cal.App.4th at pp. 1154–1155.) On the way home to Los Angeles, Verlinde operated the stick shift and pedals while Vessells steered the car. Vessells eventually fell asleep and Verlinde took over the steering wheel. Verlinde crashed the car near Encinitas, resulting in the death of one of her passengers and injuries to her other passengers, including Vessells. (*Id.* at pp. 1155–1157.) She was convicted of several offenses, including DUI and causing injury to two persons (Veh. Code, § 23153, subd. (a)) and driving with a BAC of over 0.08 percent and causing injury to two persons (Veh. Code, § 23153, subd. (b)). (*Verlinde, supra,* at p. 1154.) The jury also found she personally inflicted GBI on two persons within the meaning of Penal Code section 12022.7, subdivision (a). (*Verlinde, supra,* at p. 1154.)

On appeal, Verlinde challenged the constitutionality of section 12022.7, subdivision (a), as amended in 1995, on due process grounds. Prior to January 1, 1996, the statute read, in pertinent part: "Any person who, *with the intent to inflict the injury,* personally inflicts great bodily injury . . . ." (Stats. 1994, ch. 873, § 3, p. 4427, italics added.) The statute was amended effective January 1, 1996, to delete the "with the intent to inflict the injury" language. (Stats. 1995, ch. 341, § 1, p. 1851.) Verlinde claimed the amended statute, which was operative at the time of her crimes, violated her due process rights because it "in effect authorize[d] strict liability for a great bodily injury enhancement regardless of the state of mind of the defendant or the degree of foreseeability of the injury because the enhancement liability is unrelated to the defendant's mental state and the defendant's act." (*Verlinde, supra,* 100 Cal.App.4th at p. 1166.) The *Verlinde* court disagreed, reasoning that the amended statute comported with due process because the deletion of "with the intent to inflict the injury" language "chang[ed] [the statute] from a specific intent to a general intent enhancement," and thus the "Legislature did not ignore the mens rea requirement by amending the statute." (*Id.* at pp. 1166–1167.)

Similarly, the court in *Carter* held that section 12022.7, former subdivision (d) required a showing of general intent to inflict GBI, not specific

intent. (*Carter, supra*, 60 Cal.App.4th at p. 756.) At the time of the crimes committed in *Carter*, section 12022.7, former subdivision (d) provided for GBI enhancements in cases involving domestic violence and, like section 12022.7, subdivision (a) following the 1995 amendment, contained no explicit mens rea requirement. (See *Carter, supra*, at p. 755; § 12022.7, subd. (a); § 12022.7, former subd. (d).) In concluding that former subdivision (d) of section 12022.7 required a showing of general intent to inflict GBI, the court noted that subdivisions (a) and (c) of section 12022.7 were amended in 1995 to delete their specific intent requirements, and saw no reason why the Legislature would have intended to require a "more stringent" specific intent requirement in cases involving domestic violence. (*Carter, supra*, at p. 756.)

Thus, *Verlinde* and *Carter* interpreted the 1995 amendment to subdivision (a) of section 12022.7 as *relaxing* the specific intent requirement of the statute to a general intent requirement, rather than eliminating the mens rea requirement altogether. We respectfully disagree with these cases to the extent they hold or suggest that subdivision (a) of section 12022.7 contains its own general criminal requirement or requires a showing of general intent to inflict GBI or commit the act causing GBI separate and apart from the intent to commit the underlying felony or attempted felony. As discussed, the statute does not define a substantive crime or public offense but only authorizes additional punishment when a defendant personally inflicts GBI "*in the commission of a felony or attempted felony*" for which the defendant has been convicted in the first instance. (§ 12022.7, subd. (a), italics added.) As such, the statute is not, as defendant claims, "unrelated to the defendant's mental state and the defendant's acts."

This point was well illustrated in *Coria, supra*, 21 Cal.4th at pages 879 and 880. There, the court held the defendant could not be convicted of the substantive crime of manufacturing a controlled substance (Health & Saf. Code, § 11379.6) without proof he knew the character of the substance manufactured. (*Coria, supra*, at p. 880.) In rejecting the Attorney General's claim that the statute had no mens rea requirement, the court distinguished federal and state cases upholding the imposition of enhanced penalties for distributing illegal drugs within 1,000 feet of a school and for possession with the intent to distribute illegal drugs exceeding certain weight limits—even in the absence of the defendant's knowledge of a nearby school or the weight of the drugs distributed. (*Id.* at pp. 879–880 and cases cited.) The court explained that such enhancement statutes do not violate due process because they do not criminalize otherwise innocent activity; rather, they incorporate the underlying crimes which already contain a mens rea requirement. (*Id.* at p. 880, citing *People v. Meza* (1995) 38 Cal.App.4th 1741, 1748 [45 Cal.Rptr.2d 844].) The court said: "In other words, because it is unlawful to distribute illicit drugs regardless of the amount or location, the

accused, by participating in such an illegal transaction, assumes the risk of the enhanced penalties even absent knowledge of the facts bringing his conduct within the enhancement statutes." (*Coria, supra,* at p. 880.)

Like the weight limit and school proximity enhancement statutes discussed in *Coria*, section 12022.7, subdivision (a) does not criminalize otherwise innocent activity. It does not authorize an enhanced penalty for personally inflicting GBI unless the defendant has been convicted of a felony or attempted felony and has personally inflicted GBI in the commission or attempted commission of that crime.

Here, the jury was required to find a concurrence of wrongful intent and a prohibited act in order to convict defendant of the underlying felony DUI. (See *People v. Alvarez* (1996) 14 Cal.4th 155, 220 [58 Cal.Rptr.2d 385, 926 P.2d 365]; Judicial Council of Cal., Crim. Jury Instns., CALCRIM No. 252.) To this end, the jury was properly instructed with CALCRIM No. 252 that, in order to convict defendant of the felony DUI charges in counts 2 and 3, it had to find he committed the "prohibited act on purpose" "with wrongful intent."[3] The jury was also properly instructed using CALCRIM No. 3160 that: "If you find the defendant guilty of the crimes charged in Counts 2 and 3, you must then decide whether, for each crime, the People have proved the additional allegation that the defendant *personally inflicted* great bodily injury." (Italics added.) Thus here, there was no instructional error or due process violation.[4]

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[3] As given, CALCRIM No. 252 told the jury: "The crimes charged and the lesser offense, require proof of the union, or joint operation, of act and wrongful intent. [¶] The crime[s] of involuntary manslaughter, driving under the influence causing injury, and driving with a blood alcohol level of 0.08 percent or greater causing injury requires general criminal intent. For you to find a person guilty of these crimes, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act on purpose, however, it is not required that he or she intend to break the law. The act required is explained in the instruction for that crime."

[4] *People v. Sargent* (1999) 19 Cal.4th 1206, 1222 to 1223 [81 Cal.Rptr.2d 835, 970 P.2d 409] is not contrary to our conclusion. In these pages, the court cited section 12022.7, former subdivision (d), as interpreted in *Carter, supra,* 60 Cal.App.4th at pages 755 and 756 as an example of a "general criminal intent statute," despite language to the contrary, which only described the context in which the statute applied. The court did not hold that section 12022.7, subdivision (a) is a general intent statute, or requires a showing of general intent to inflict GBI. (*People v. Friedeck* (2010) 183 Cal.App.4th 892, 899 [107 Cal.Rptr.3d 667] [cases are not authority for matters not discussed].)

*See footnote, *ante,* page 165.

## V. DISPOSITION

The matter is remanded to the trial court with directions to correct the sentencing minute order and abstract of judgment to reflect that the court imposed $9,000 restitution and (suspended) parole revocation fines, rather than $10,000 fines. (§§ 1202.4, subd. (b), 1202.45.) The trial court is further directed to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

McKinster, Acting P. J., and Richli, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 2, 2011, S189248.